## PENICK & FORD, Limited, Inc., v. CORN PRODUCTS REFINING CO.

### No. 6503.

District Court, N. D. Illinois, E. D.

July 16, 1931.

Dyrenforth, Lee, Chritton & Wiles, of Chicago, Ill. (John H. Lee, of Chicago, Ill., O. N. Elliott, of Cedar Rapids, Iowa, and Horace Dawson, of Chicago, Ill., of counsel), for plaintiff.

Barnett & Truman, of Chicago, Ill. (Percival H. Truman, of Chicago, Ill., and Melville Church, of Washington, D. C., of counsel), for defendant.

### Findings of Fact.

LINDLEY, District Judge.

(1) That for several decades prior to 1924 it was the general practice in American factories for manufacturing starch from corn to permit the gluten overflow water and substantially all of the starch wash water to run into the sewer, thus involving heavy losses and polluting the streams.

(2) That plaintiff and its predecessor at Cedar Rapids, Iowa, for years prior to 1924 manufactured cornstarch and followed said practice.

(3) That defendant operates various cornstarch factories and produces about 50 per cent. of the cornstarch manufactured in America, and that it followed that practice prior to 1925, with the following exceptions:

(a) For a period of a week or ten days in February-March, 1911, an attempt was made at defendant's Argo plant to return a portion of the gluten water to the steeps and another portion to the separating system, which experiment resulted in failure. The starch was so affected as to render it unmarketable and unusable. The Argo plant was at that time equipped with re-tables, but it does not appear that any attempt was made to purify the starch by making use of such re-tables or filters. The starch on the tables in the Argo experiment was polluted by a high percentage of undesirable solubles contained in the gluten water which remained in the starch; and in the Argo experiment fresh water was not employed to wash the starch free from solubles, and, serving as make-up water, to carry the solubles back into the separating system.

(b) Generally, during the period of 1910-1912, it was not the practice at Argo to reuse gluten water in the steeps and wet starch house; but, while the evidence is conflicting on this point, it is possible that some gluten water was so reused, the remainder being allowed to run to the sewer, thus affording an avenue for escape of solubles. Assuming that a portion of the gluten water was returned and reused in the period of 1910-1912, it was only because of water shortage, and without attaining the benefits of a "bottled-up" system as understood in the present litigation. If defendant made any such desultory use of gluten overflow water, it failed to employ fresh water to wash the starch and carry the solubles therefrom back into the separating system; and if any use was made of the feature of returning some gluten water to the steeps in the period of 1910-1912 such feature, if used at all, was abandoned some time during that period.

(c) During a period commencing in 1912 or 1913 and continuing into the year 1926, it was the practice at the Argo plant to reuse, in the wet starch house, only a very small percentage of the water from the second tables (re-tables) probably about 2 gallons per bushel of corn ground out of 30 gallons required; and during the period from 1912, or 1913, into the year 1926, it was the practice to allow the gluten overflow water from the first table gluten settlers and a large part of the water from the starch settlers to run into the sewer.

(4) That for a period extending from 1908 to 1925, defendant was seriously concerned with the problem of sewage disposal and made efforts to reduce to a minimum its losses to the sewers; that during the period of 1919-1925 defendant studied the problem intensively, and collaborated with the Sanitary District of Chicago in trying to determine the best type of sewage disposal plant to be employed for taking care of wastes from defendant's cornstarch factories; and that satisfactory treatment of the sewage would have required enormous disposal plants, costing vast sums of money.

(5) Defendant has, for very many years, employed a large force of executives, superintendents, chemists, and engineers familiar with the manufacture of cornstarch, and, notwithstanding the apparent need for bottling up its factories, defendant's experts failed to bottle up defendant's plants until after plaintiff's plant was bottled up and in operation in accordance with the Widmer process.

(6) A. W. H. Lenders, a veteran in the cornstarch industry, was superintendent of the Argo plant in the period of 1910-1912. Of an inventive turn of mind, he has procured some twenty patents relating to the industry; the attempt to bottle up the Argo plant in 1911 was made under his instructions; McCoy, an experienced wet starch house foreman, was present during the experiment, knew that that attempt resulted in failure, but failed to produce a solution of the problem, and defendant's cornstarch factories continued to operate with large yearly losses until a time subsequent to the placing in operation of the bottled-up system in plaintiff's plant.

(7) In the period of July-August, 1924, John M. Widmer conceived a process for enabling cornstarch factories to be bottled up. His concept involved a combination of the following steps (Widmer patent):

(a) Return of all the gluten water to the process—about one-third to the steeps and about two-thirds to the wet starch system.

(b) Withdrawal of a relatively small stream of steep water, and concentration thereof, this water containing the solubles which were in the gluten water and additional solubles dissolved from the corn in the steeps.

(c) Purifying the starch by washing it with fresh water, and employing the starch

wash water, serving as make-up water, as a means for carrying the solubles from the starch back into the separating system—the whole process being of such a character as to maintain a proper water-balance and a proper solubles-balance, the avenue for escape and recovery of solubles being such as to maintain the solubles concentration in the wet starch system within workable limits, and this being accomplished by supplementing such withdrawal of solubles from the system as occurs through the avenues of withdrawal of the gluten, the coarse slop, the fine slop, and the germ, by the withdrawal and concentration of a stream of water from the steeps which is relatively small as compared with the volume of gluten water and starch wash water which formerly went to the sewer.

(8) The purpose of the Widmer process was the recovery of all wastes and the prevention of stream pollution, which is accomplished in a complete and satisfactory manner by the combination of steps set forth.

(9) In addition to the novel combination of steps set forth in (7), the inventor recognized the fact that gluten overflow water and starch filtrate, which would constitute practically the whole source of supply of water for the wet starch system under the new process, are infested with micro-organisms; and that inasmuch as the source of water supply would be a tainted source, sterilization, in the sense of holding in check the micro-organisms sufficiently to permit the use of the tainted waters, must be practiced. Dr. Widmer determined, inasmuch as heat from the evaporators was available at the plant, to make use of that heat as a sterilizing agent applied to the gluten water; and he further made use of the starch wash water as a vehicle for carrying fresh sulphurous acid in the separating system. The steam from the evaporators was capable of heating the gluten water to high temperature, and if use were to be made of the heat from the evaporators, it was desirable to make such use before the gluten water was distributed to the separating system.

(10) The preponderance of evidence is to the effect that, in the Argo experiment, not only was the starch on the tables rendered unsalable by the presence of solubles, but, also, the wet starch system slimed to such an extent that it was necessary to discontinue the experiment.

(11) That continuous vacuum filters, and other filters of types now employed in plaintiff's and defendant's plants, have been known since 1912 to be available for washing solids free from solubles; that filters for washing starch were installed at the plant in Cedar Rapids as early as 1915, and in defendant's Pekin factory in 1921, or earlier. Yet defendant took no steps whatever to avail itself of the use of filters for starch washing in a bottled-up system.

(12) At the time when Widmer made his invention (patent No. 1,585,452), it was not obvious to those skilled in the art of manufacturing starch from corn that factories of this character could be bottled up.

(13) The preferred method of Widmer's process described in the patent was successfully put into operation at plaintiff's cornstarch factory in February, 1925, and has operated successfully in there until this time; plans for such bottling up were made about October, 1924.

(14) At the time plans for bottling up the plant were considered, it was not equipped with sufficient filters to enable the counter-current system of washing starch to be employed. The starch was filtered and washed by the use of about eleven gallons of fresh water, the filtrate being returned to the wet starch system. This produced a merchantable, usable starch.

(15) In the practice at the Cedar Rapids plant from February, 1925, to December, 1927, when the counter-current system of washing was not employed, the cake of starch on the filter was subjected to a second washing operation with fresh water, and this wash water, carrying about 0.4 per cent., or less, of the corn on a dry substance basis, was carried, in the form of solubles, to the sewer.

(16) Plaintiff expended a large sum of money in bottling up its Cedar Rapids plant. At the outset, the question of the advisability of purchasing sufficient additional filters to permit the installation of the counter-current system of washing the starch was discussed by the company's officials. The cost of obtaining new filters for the purpose would have amounted to $80,000 to $90,000, and it was computed that there would result a net saving which could be effected amounting to about $8,000 per year. Plaintiff had other uses for its capital at that time and concluded not to incur the large additional expense incident to the purchase and installation of filters to enable the counter-current system of washing to be employed.

(17) When the operation of the bottled-up system was instituted in plaintiff's Cedar Rapids plant, the losses to the sewer were noted. The question of the advisability of procuring secondhand filters was then consid-

ered (in March, 1925), and the purchasing agent of the company was instructed to procure prices on secondhand filters, but found no such filters available.

(18) Plaintiff continued to operate by the use of a single filter with double washing of the cake; but in the summer of 1925 began negotiations with Union Starch Company, which resulted in that company becoming a licensee. In the fall of 1925, plans were considered for the installation of the bottled-up system in the plant of the licensee at Granite City, Ill.; and in February, 1926, drawings were made showing suggested layouts for the plant, involving counter-current washing of the starch. In the summer of 1927 filters were ordered for the purpose of installing the counter-current system of washing in plaintiff's plant, and this system was placed in operation in December, 1927. The discussions which occurred among the officials of the plaintiff company with reference to counter-current washing, the inquiries made looking to the possible purchase of secondhand filters in March, 1925, to enable the Cedar Rapids plant to employ the counter-current system of washing starch, the installation of a system in the plant of plaintiff's licensee, Union Starch Company, employing the counter-current system of washing, and finally the installation of the counter-current system of washing in plaintiff's Cedar Rapids plant, all occurred without knowledge on the part of plaintiff that McCoy claimed to have invented the counter-current system of washing starch and all occurred prior to the issuance of McCoy's patent pertaining to this feature.

(19) The counter-current system of washing solids was known prior to the Widmer invention, and was disclosed in prior art patents which are in evidence, although not applied necessarily to the purpose of washing starch; and it was well known in the art that the counter-current principle of washing solids would permit the use of a minimum amount of wash water.

(20) The counter-current principle of washing was utilized in the steeps, in the germ-washing system, in the coarse slop system, and in the fine slop system of corn starch factories, long prior to the Widmer invention, and the principle was fully disclosed in Wright's publication, entitled "Industrial Filtration," prior to the Widmer invention.

(21) The counter-current principle of washing solids in filters in accordance with the disclosure in "Industrial Filtration" was publicly used by Pfizer & Co., Inc., in Brooklyn, prior to the McCoy invention.

(22) Dr. Widmer was the first to discern that highly concentrated solubles in corn starch could be washed from the starch and carried back into the separating system, in a bottled-up factory; and that the purification of the starch and the employment of the starch filtrate as make-up water was an important feature in the successful bottling up of corn starch factories.

(23) Defendant did not originate the practice of filtering starch in modern filters. Such practice was instituted at the plant in Cedar Rapids in 1916. The plate and frame type of filter was employed for filtering starch as early as 1907. If wash water were used in the cake in such filters, the wash water would serve to displace the tainted water in the cake.

(24) Counter-current washing of solids was well known prior to the Widmer invention, was known to call for the use of a minimum amount of wash water, and was available for use by Dr. Widmer in his process; and, after Widmer disclosed the combination of steps comprising the utilization of the gluten water partly in the steeps and partly in the separating system and the washing from the starch of the solubles therein and carrying them with the wash water back into the separating system, it required nothing more than ordinary engineering skill to apply the counter-current principle of starch washing to the bottled-up system.

(24-a) Plaintiff's representatives were familiar with the counter-current principle of washing solids and contemplated in 1924, and in March, 1925, its use for purifying the starch produced by the Widmer process. Plaintiff did not expend an additional $80,000 to $90,000 to install this feature in the Cedar Rapids plant, but did utilize the principle in the plant of its licensee, Union Starch Company. The principle, being old and well known, was available to all who might be authorized to employ the Widmer bottled-up process.

(24-b) Oliver continuous filters, shown in the 1919 catalogue of Oliver Continuous Filter Company, made use of the feature of displacement of solutions in solids, the feature of "weak solutions and water washes * * * independently applied," and the feature of counter-current wash on a single filter.

(24-c) The 1918 catalogue of Colorado Iron Works Company shows the continuous

Portland vacuum filter and discloses the principle of counter-current washing and the feature of the use of filtrate as a wash, and the additional feature of the use of fresh water as a wash.

(24-d) Wright, in "Industrial Filtration," sets forth the availability of continuous type filters for starch purposes in the following language: "Starch—The free filtering character of this product calls for continuous filters. There is no valid reason for the use of other type machines for this work."

(25) Double filtration of starch was practiced at defendant's Pekin plant in 1921. At that time there was no especial need for counter-current washing since the filtrate ran to the sewer.

(26) There is no disclosure in the prior art patents in this case of the broad concept of the Widmer process, namely, that of the combined steps of returning a minor portion of the gluten water to the steeps, a major portion of the gluten water to the separating system, and the purification of the starch by filtering and washing with fresh water, and using the filtrate, as make-up water, to carry the solubles back into the separating system.

(27) The Moore patent relied upon relates to the casava starch art. Moore employed no steeps. His patent did not suggest, to those skilled in the cornstarch art, the Widmer process. Jebb's (Lake) British patent, No. 4902, of 1882 is for an antiquated process, which did not realize or suggest the Widmer invention. It could not accomplish the purpose of the Widmer invention. The Steffen patent pertaining to the production of starch from potatoes does not disclose or suggest the broad concept of Widmer. Steffen does not show steeps and does not wash starch and utilize the wash water for carrying the solubles back into the separating system where they may be recovered.

(28) The Argo experiment of February, March, 1911, was the closest approach to Widmer, but it failed completely and decisively. It did not employ the combination of steps comprised by the broad concept of the Widmer invention above mentioned.

(29) The Widmer process constituted a contribution to the art of manufacturing starch from corn which is of immense value to the art, resulting in the saving to the industry of vast sums of money annually and obviating the necessity for the installation and operation of enormous sewage disposal plants in connection with cornstarch factories to prevent pollution of streams.

(30) Widmer preceded McCoy in conceiving, putting into operation, and disclosing by patent application the broad underlying concept which renders operative and practicable the bottling up of cornstarch factories, namely, a combination of steps hereinbefore set forth.

(31) Sterilization of the waters employed in bottled-up systems, in the sense of holding in check the micro-organisms in these waters sufficient to prevent sliming and fouling of the system, is essential. Such sterilization is practiced by plaintiff and by defendant.

(32) The gluten overflow water which is returned to the wet starch system ordinarily comprises in the neighborhood of twenty gallons per bushel of corn ground, and the filtrate from the starch washing operation comprises about four gallons of gluten water per bushel of corn ground. The starch water is vitiated by commingling with the gluten water. These waters are subjected, in both plaintiff's and defendant's plants, to the action of sterilizing agents, namely, heat and sulphur, in sufficient degree or intensity effectively to hold in check the micro-organisms and prevent sliming and fouling of the wet starch system.

(33) The use of heat and sulphur in wet starch systems for sterilizing purposes, in the sense of checking micro-organisms sufficient to prevent sliming and fouling, was well known prior to the Widmer invention.

(34) A temperature of 125 degrees F. is highly effective as a sterilizing agent applied to the gluten water. A temperature of in the neighborhood of 100 degrees F. is highly effective in checking the oidia, which are the worst slime formers which infest cornstarch factories. These slime formers become particularly evident and obnoxious during the short shut-downs of a few days or a week which occur normally, from time to time, in cornstarch factories.

(35) A temperature of 105 degrees to 110 degrees is quite effective in checking the oidia.

(36) Combinations of heat and sulphur at temperatures of 95 degrees F. and up exercise a distinctly inhibiting effect; and where temperatures ranging from 100 degrees to 110 degrees are employed in conjunction with sulphur concentrations such as are used by plaintiff and defendant in their wet starch

systems, the micro-organisms are effectively held in check.

(37) The yeast-like micro-organisms which infect wet starch systems are aerobic in character, and the reels and shakers in such starch systems provide conditions especially favorable to their propagation and growth. Defendant, in the first, second, and third bottlings employs especially effective means for sterilizing in the fine slop system, where trouble from stoppage of the drainage is most imminent. The precautions taken by defendant in protecting the fine slop system are such as notably to decimate or decrease the micro-organisms passing through this portion of the system.

(38) In plaintiff's and defendant's factories the corn is subjected to such high temperatures (about 125 degrees F. to 140 degrees F.) and such high fresh sulphurous acid concentrations (.15 per cent. to .3 per cent.) as to practically destroy oidia and other micro-organisms in the corn. Even the spores of the oidia probably are destroyed.

(39) Widmer, in his experimental work which preceded the bottling up of the Cedar Rapids plant, showed the equivalency of sulphur and heat for sterilizing gluten water, and showed that both were effective agents for the purpose. It was known, prior to the Widmer invention, that combined heat and sulphur would serve to hold micro-organisms in check in a wet starch system. A factor of safety is desirable, and if precautions against micro-organisms are released too far, the system will slime and become foul. While odors in cornstarch factories, due to a certain amount of putrefaction action, are somewhat noticeable regularly, perhaps, very decided stenches arise after sliming occurs. The same precautions which serve to prevent sliming serve also to prevent the after-effects of foul odors.

The organisms present in gluten water vary greatly, especially where the gluten water is not presterilized before being distributed to the separating apparatuses in the wet starch system. In the period of May to July, 1930, Argo gluten water varied in micro-organisms from 13,000 per cc. to 2,500,000 per cc. Fluctuations within a day at Argo varies from 13,000 organisms per cc. to 1,400,000 per cc. This occurred in the period of June 17, 18, 1930. Again, on June 10, 1930 to June 12, 1930, there was a variation from 28,000 per cc. to 2,500,000 per cc. Such variation must be accounted for only by fluctua-

tions in the use of sterilizing agents, heat and sulphur. They show that a "normal system" does not exist of itself, but that sterilizing agents must be used in such manner as to prevent sliming and fouling of the system. Gluten water is infested with micro-organisms and must be dealt with accordingly, if returned to the separating system in accordance with a bottled-up process.

(40) The gluten water returned to the system in the Argo plant amounts to about twenty-four gallons per bushel of corn ground, including the gluten water which remained in the starch when it settled on the table. Assuming the plant to operate on an average of 70,000 bushels per day, the gluten water returned to the wet starch system amounts to 1,680,000 gallons per twenty-four hours. On June 10, 1930, the micro-organisms in Argo gluten water ran as high as 2,500,000 per cc. This shows the possible danger from the use of gluten water in the separating system. Storage for 48 hours of Argo gluten water infested as indicated above showed an increase of organisms to 27,000,000; other samples increased to 88,000,000 per cc. This is comparable with what occurs during shut-down periods, which must be expected in storage factories. Assuming 1,000,000 per cc. there would be returned with the Argo gluten water every twenty-four hours six hundred and thirty-five quadrillions of micro-organisms (635,880,000,000,000). Substantially no organisms would be introduced with the steeped corn, unless the steeped corn were washed with unsterilized gluten water.

(41) The amount of sulphur introduced into the wet starch system with the steeped corn has an influence on results.

(42) McCoy's alleged invention is subsequent to the Widmer invention. It is immaterial, in a case where inventive discovery has been clearly established by proofs, whether or not McCoy was able to complete his invention without knowledge of the details of the Widmer invention. Defendant was informed that plaintiff's process involved the return of all waste waters.

(43) Frequent contacts between the companies, the relations between which appear to have been friendly and close, existed. Defendant's patent attorney acted also as the patent attorney for plaintiff. McCoy visited Cedar Rapids April 3, 1925, seeking information.

(44) It appears that there is, at least, some advantage in the preferred practice set

forth in the Widmer patent, namely, presterilization of gluten water before it is distributed to the separating system. Under the preferred process, the gluten water carries practically no organisms into the wet starch system.

Odium cultures in large numbers (3,800,-000 per cc.) are destroyed in ten minutes at 130 degrees F., and are reduced to a negligible number in one minute at the same temperature. Levine's work, Plaintiff's Exhibit 19, page 20, shows the practical destruction of organisms at 125 degrees F., excepting only some bacteria.

At Pekin and Argo as high as 2,500,000 organisms per cc. may enter the wet starch system with the gluten water. Micro-organisms cannot be washed from the starch on the filters. Fluctuations in the gluten waters are eliminated by presterilization at high temperatures so that peak-loads of micro-organisms are avoided tending to greater uniformity and efficiency in operations. While it is admitted that sliming occurs in defendant's plants every once in a while, sliming does not occur in plaintiff's Cedar Rapids plant. One result is to render it unnecessary, at least in some degree, to vary the sulphurous acid introduced to overcome increasing loads of micro-organisms.

(45) Various sterilizing agents are known in the art. Ozone for use in wet starch system was disclosed in Eckland patent 1,726,000.

(46) Defendant's first Pekin bottled-up system was employed in Pekin during the period of December, 1925, to October 4, 1926. It employs the broad concept of the Widmer invention, namely, the combined steps of a return gluten water line with a branch to the steeps and a branch to the wet starch system, and a line returning the starch wash water to the wet starch system, where it is employed as make-up water. The returned waters are effectively sterilized, in the sense of the Widmer patent, before they pass into the various apparatuses where the separating operations are performed; and in this process especial care is taken to sterilize the returned waters in the fine slop system, in the sense of holding in check the micro-organisms sufficiently to prevent sliming and fouling of the system. In the tank marked "hot" from which a mixture of freshly sulphurized starch wash water and gluten water passes to the fine slop system, a temperature of 125 degrees F. is employed. The heat alone in this tank is sufficient to greatly reduce the micro-organisms. Fresh sulphurous acid is employed in this tank in rather high concentration, giving the concentration as .07 per cent. These combined agencies, according to the testimony of the bacteriologists for both parties, would most effectively destroy micro-organisms.

(47) The first Pekin bottled-up system infringes claims 1, 2, 4, 5, 8, 9, 13, 14, and 18 of the Widmer patent.

The first Pekin bottled-up system was installed in defendant's Argo factory and put into operation for a comparatively short period of time before between November, 1926, and May, 1927, delay in the installation having occurred by reason of the necessity of awaiting the arrival of filters.

(48) The second Pekin bottled-up system was employed at Pekin in the period of October 4, 1926, to October 3, 1928. It is substantially in accordance with the process claimed in the Moffett patent. This process employs the broad concept of the Widmer patent, namely, a return line from the gluten settler which has a branch to the steeps and a branch to the wet starch system, and a return line carrying the starch filtrate to the wet starch system. The waters are effectively sterilized in accordance with the meaning of that expression "sterilized" as employed in the Widmer patent. This process provides special effective means for accomplishing sterilization in the wet slop system. The starch filtrate is returned from the filters to the tank marked "hot"—124 degrees F. Filtrate carries fresh sulphurous acid, so that the starch filtrate passes to the fine slop system, where it meets the gluten water which carries the fine slop through the silks. The work of Dr. Levine, plaintiff's expert bacteriologist, clearly establishes the fact that the materials passing through the fine slop system are treated in such manner as to cut down or destroy micro-organisms carried into the fine slop system by the gluten water menstruum. Gluten water passes from the tank marked "warm" through one line to the coarse slop system and through another line to the germ washing system. From the germ washing system, lines run to the separators; and the gluten water thus meets fresh sulphurous acid which enters the system with the corn which has been steeped in a rather high concentration of fresh sulphurous acid. All of the waters commingle by the time they reach the clean-up shakers, and all pass through a single line to the tables, where a temperature of 94 degrees F. and an average sulphur concentration of .05 per cent. are

maintained. The evidence shows that sufficient sterilization is maintained throughout the system, within the sense of the Widmer patent, to prevent sliming and fouling of the system. The experts on both sides agree that the system is thoroughly sterilized; and it is true, of course, that the gluten water partakes of the sterilizing action effected by the combined heat and sulphur.

(49) The second Pekin bottled-up system was put into operation in the Argo plant late in the year 1926, and continued in operation at that plant until October or November, 1928. The exact date when the operation of this system was instituted in Argo is not important at this stage of the proceedings.

(50) The third bottled-up system has been operated in Pekin since about October 3, 1928. This system operates in accordance with the process claimed in the Jefferies patent.

It retains the salient feature of the two preceding bottled-up processes which were practiced by defendant, namely, especial care to thoroughly sterilize in the fine slop system. The freshly sulphurized starch filtrate passes through a heater to the tank marked "hot" which is maintained at 107 degrees to 110 degrees F. A line carries the heated and freshly sulphurized starch filtrate to the fine slop system, where it meets the gluten water menstruum which passes therethrough. Temperatures of 103 degrees to 105 degrees in the fine slop system, combined with the sulphur concentration employed by defendant, sterilize the fine slop system most thoroughly. The gluten water passes from the tank marked "warm" through the coarse slop system into the germ washing system; and lines from the germ washing system pass to the separators, and a line passes from the coarse slop system to the germ separation system. Thus the gluten waters meet the fresh sulphurous acid which enters the system with the steeped corn. All of the waters pass to the clean-up shakers below the fine slop system, and thence, through a single line, to the tables. A temperature of about 96 degrees F. and an average sulphur concentration of about .043 per cent. suffices to sterilize the menstruum passing over the tables. The experts on both sides agree that sterilization is practiced in the third Pekin bottled-up system, in the sense of holding the micro-organisms sufficiently in check to prevent sliming and fouling of the system. This system employs booster heaters between the silks of the fine slop system, and these heaters serve to maintain a temperature amply high, in conjunction with the sulphur concentration employed, to accomplish highly effective sterilization. Micro-organisms are largely eliminated during their passage through the silks in this system. The percentage of reduction runs from 21.3 to 99.2. In the third bottling, as in the first bottling and in the second bottling, defendant is especially careful to protect the fine slop system against micro-organisms.

(51) The third Pekin bottling has been used from about October 3, 1928, up to the present time in the Argo plant. It corresponds very closely with the third bottling at Pekin, and employs the booster heaters in the fine slop system, which are claimed in the Jefferies patent. The temperatures in the reels of the fine slop system are slightly higher than in the third bottling at Pekin; and fresh sulphurous acid passes with the starch filtrate directly to the fine slop system. In the Argo third bottling an additional feature is employed, namely, a sulphur tower interposed in the course of the starch filtrate immediately preceding the tank marked "hot." Also, provision is made in the Argo plant for the passing of a certain amount of gluten water across the line entering the tank marked "warm" to the tank marked "hot." Also, provision is made for passing sulphurized starch wash water into the tank marked "warm." The returned line from the gluten settler has a branch going to the steeps and another branch going to the wet starch system; and the return starch filtrate goes to the wet starch system. The gluten waters passing from the tank marked "warm" ultimately meet fresh sulphurous acid which enters the wet starch system with the steeped corn. All of the waters commingle below the fine slop system and pass through a single line to the tables, where a temperature of about 92 degrees F. and an average sulphur concentration of .049 $SO_2$ are employed. The experts for both parties agree that the system is effectively sterilized within the meaning of the Widmer patent. The agencies which effect sterilization, namely, heat and sulphur, are provided at points preceding the distribution of the waters in the separating system, except that additional heat is added by means of the booster heaters between the reels of the fine slop system.

(52) All three of defendant's bottled-up systems which have been referred to in detail above were employed in defendant's Kansas City plant in the periods preceding October 18, 1928, and it follows that steri-

lization of the waters in the separating system or about to enter the separating system was effected.

(53) Defendant's fourth bottling has been practiced at defendant's Kansas City plant since about October 18, 1928, except for experimental periods: Defendant has, in the fourth bottling, made a transposition of lines, but the cardinal principle of the Widmer process, namely, a return gluten water line sending a branch to the steeps and another branch to the separating system, and the return of the starch filtrate to the separating system is employed. Here, the gluten water stream has two branches leading to the separating system, one branch passing to the tank marked "hot" and another to the tank marked "warm." The gluten water stream passing through the tank marked "hot" is heated to 110 degrees F., and then passes to the fine slop where a temperature of 100 degrees F. to 104 degrees F. is maintained in the washing silks. The freshly sulphurized starch wash water from the starch washing station passes through a line to the tank marked "warm," the temperature of the filtrate being indicated on D. 19 as 102 degrees F., and the temperature in the tank marked "warm" being indicated on the diagram as 94 degrees F. Such temperature, with the sulphur concentration employed, is quite sufficient, according to the testimony of expert bacteriologists, to severely check and probably largely reduce the micro-organisms in the gluten water. Lines from the tank marked "warm" run to the coarse slop system and to the other stations in the early part of the separating system, so that sterilized gluten water is carried to the early parts of the wet starch system. Also, fresh sulphur enters the early part of the system with the steeped corn. The menstruum which enters the fine slop system comprises gluten water which has been treated with sterilizing agents rather effectively, mingled with starch filtrate which passes with the gluten water from the tank marked "warm" to the early part of the separating system.

Defendant's experts admit that sterilization, within the meaning of that term as employed in the Widmer patent, is practiced in this process.

Defendant, in this process, heats the gluten water to 110 degrees F. In the light of the testimony of the expert bacteriologists for both parties, the effect of this slight modification of the Widmer process is to kill the oidia almost as effectively as would be done by a temperature of 130 degrees to 140 degrees, bearing in mind that sulphur is present in the gluten water when it is heated. The treatment which defendant employs in this process is sufficiently effective in the light of the scientific disclosures which have been named during the course of the litigation, to dispose of the worst slime former, the oidia. It is undoubtedly true that sterilization, in the sense of the Widmer patent, is practiced.

(54) The McCoy patent discloses no inventive thought or idea over the prior art patents, the prior art publications or catalogues including "Industrial Filtration" by Wright, and over the prior use and prior knowledge of Pfizer & Company at Brooklyn. The feature of counter-current washing of solids in filters arranged in tandem was planned by Pfizer & Company with the aid and advice of the filtration experts of Filtration Engineers, Inc., in 1924, was proceeded with diligently, and the installation was completed and put into operation early in the year 1925 and prior to June 1, 1925, the first date of conception which can be claimed by McCoy, assuming him to have been the inventor of the feature of employing a counter-current wash on starch.

(55) Since Widmer precedes McCoy in the feature of purifying starch in a filter and washing the solubles back into the wet starch system in a bottled-up process, it required nothing more than the ordinary skill of the engineer to apply the well-known principle of counter-current washing of solids to Widmer's invention.

(56) Knowledge of counter-current washing of solids and the availability of that principle for starch washing was known to the officials of plaintiff in the fall of 1924 and the adoption of the principle when the Cedar Rapids plant was first bottled up was prevented only by reason of the fact that the net saving to be effected thereby did not warrant the high expense of installation as plaintiff was situated at that time.

### Conclusions of Law.

1. Plaintiff is the owner of Widmer patent, No. 1,585,452.

2. John M. Widmer was the first inventor of a process enabling cornstarch factories to be successfully "bottled up" as described in the findings of fact, thus avoiding large losses to the sewers and pollution of streams.

3. The express and realized purpose of Widmer's process was to save materials for-

merly allowed to run to the sewer and to avoid pollution of streams.

4. The underlying concept of the Widmer process, so far as this litigation is concerned and without meaning thereby to express limitations beyond those necessary to a decision herein, is a novel combination of steps producing new and important results, which may be stated as follows:

(a) Returning a minor portion, about one-third, to the steeps and a major portion, about two-thirds, to the wet starch system;

(b) Purifying the highly soluble laden starch by means of fresh wash water, employed to carry the solubles back into the separating system where the starch wash water serves as make-up water.

5. The prior art does not disclose such a combination of steps.

6. Defendant's Argo experiment amounted to nothing more than an abandoned failing experiment.

7. The combination of steps stated in conclusion 4 achieves the purpose of the Widmer invention economically calling, as it does, for the evaporation of only a comparatively moderate stream of gluten water withdrawn from the steeps, the withdrawal being sufficient, nevertheless, to maintain a solubles-balance in the wet starch system of sufficiently low character to permit successful separation in the wet starch system and successful purification in the starch filters, with a limited amount of fresh water.

8. Widmer rightfully recognized and pointed out in his patent that sterilization of the gluten water in wet starch systems, in the sense of checking micro-organisms sufficiently to prevent sliming and fouling of such systems, is essential.

9. Widmer teaches that various sterilizing methods known in the art may be employed. The utility of heat and sulphur as such sterilizing agents was well known prior to the Widmer invention.

10. Sterilization of gluten water, in the sense of the Widmer patent, is employed by plaintiff at its Cedar Rapids plant, and has been employed by defendant in each of its four modifications of bottled-up processes.

11. The Widmer process is an important contribution to the art of manufacturing cornstarch, achieves invention and saves the industry vast sums annually and overcomes a menace to the public health. It was not obvious to those skilled in the art.

12. The Widmer patent is valid as to each and all of the claims relied upon, namely, claims 1, 2, 4, 5, 8, 9, 13, 14, and 18, due effect being given to the disclaimer which was filed in the Patent Office by plaintiff.

13. The Widmer patent described a preferred method of effecting sterilization of the gluten water, but nothing in the patent indicates that there was any understanding or agreement between the Patent Office and the applicant to the effect that the patent should be limited to any specific method of sterilization.

14. Nothing appears in the record of the prosecution of the Widmer application which shows any intention upon the part of the applicant to renounce or dedicate to the public any portion of the invention.

15. Defendant has, in the practice of each of the four bottlings, or modifications which it has employed, infringed each and all of claims 1, 2, 4, 5, 8, 9, 13, 14, and 18 of the Widmer patent.

16. McCoy patent, No. 1,651,611, discloses a process which, if invented by McCoy, was subsequent to the invention of the Widmer process; and, in view of the Widmer process, the sole novelty, if any, of the McCoy process, lies wholly in the feature of employing a known specific method of washing solids, namely, a counter-current wash.

17. Counter-current washing of solids was well known prior to McCoy's alleged invention. To apply the principle to the washing and filtering of starch in a closed cycle process, in view of Widmer's disclosure of the possibility of purifying starch and carrying the solubles back into the separating system in such process, would not involve invention. It would amount to a mere double use of a well-known principle.

18. When Widmer made his invention in 1924, he contemplated a completely closed system, returning all waste waters to process. After his discovery that it was possible to purify the solubles-laden starch derived from a closed system, any and all well-known methods of filtering and purifying solids were available to Widmer, to his assignee and to its licensees.

19. Widmer knew the counter-current principle of washing solids at the time he made his invention and contemplated the use of this principle from the outset.

20. The McCoy patent is invalid as to each and every claim relied upon.

21. Double washing of starch on filters was practiced publicly in the Pekin plant of the defendant in 1921.

22. The patent to Widmer is valid and infringed by defendant. The patent to McCoy is invalid. There will be a decree for plaintiff as prayed, enjoining defendant from further infringement, directing an accounting, and dismissing defendant's counterclaim for want of equity, but in view of the filing of the disclaimer after institution of suit, without costs to defendant but at the costs of plaintiff.